AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

126 Westwood Avenue, Dayton, Ohio 45417

)
)
)
)
)
)

Case No.  3:18 mj 169

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment E

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment 1 | See Attachment 1 |

The application is based on these facts:

See Attached Affidavit of Robert Buzzard

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robert Buzzard, SA of the FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3-6-18

City and state: Dayton, Ohio

_____
*Judge's signature*

Sharon L. Ovington, US Magistrate Judge
*Printed name and title*

<u>AFFIDAVIT IN SUPPORT OF APPLICATION</u>

I, Robert Buzzard, hereby duly sworn, declare and state:

I.

<u>INTRODUCTION</u>

1.    I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), assigned to the Cincinnati Division, Dayton, Ohio Resident Agency.  I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878.  Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510.

2.    I have served as an FBI SA since January 2002.  During May 2002, FBI assigned me to its Cincinnati Division, Dayton Resident Agency and I currently serve on the Southern Ohio Safe Streets Task Force (SOSSTF).  Since that time, I have participated in investigations involving narcotics trafficking and have received specialized training on the subject of narcotics trafficking and money laundering from the FBI.  I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of

1

controlled substances, as well as methods used to finance drug transactions.

3. Based on my training and experience – including my participation in the investigations referenced above – as well discussions and interactions with other experienced FBI SA's, Task Force Officers ("TFO"), and narcotics investigators, I am familiar with the manner in which drug trafficking organizations in Mexico and their customers in the United States smuggle, safeguard and distribute narcotics and then collect as well as launder the proceeds therefrom. For instance:

a. Mexican drug trafficking organizations send individuals to the United States, carrying with them bulk amounts of controlled substances (hereinafter "couriers"). These individuals sometimes cross the United States – Mexico border via a car or other vehicle that contain hidden compartments commonly known as "traps." With the controlled substances concealed in these traps, the courier then transports the controlled substances to recipients in the United States who either distribute or sell these narcotics here. Mexican drug trafficking organizations also use trap vehicles to transport from the United States to Mexico money that the enterprise has

collected here from its drug trafficking activity. On other occasions, Mexican drug trafficking organizations send couriers to the United States who have concealed the controlled substances within their bodies (hereinafter "internal body couriers"). Internal body couriers often obtain one-way airline tickets and fly from the United States-Mexico border region to their intended destination further inside of the United States; once there, internal body couriers expel or remove the narcotics from their body and deliver these illegal drugs to a recipient in this country. On occasion, the internal body couriers will receive drug proceeds while in the United States and conceal this cash on their person or in their luggage during their return travels to Mexico.

   b. Upon receipt of the controlled substances in the United States, the domestic customers of the Mexican drug trafficking organizations then sell these illegal narcotics through their own local distribution networks. The domestic customers often store these controlled substances at various locations commonly referred to as stash houses. After selling these controlled substances to their own clients, the domestic customers collect the money from their sales and arrange for a

portion of the money to be transferred to their source of supply in Mexico.

c.      To collect these funds, Mexican drug trafficking organizations often will send individuals to the United States, or rely on individuals already in this country. Upon collecting this money in the United States, individuals will return these funds to Mexico in the ways described above as well as through wire transfers or depositing funds in domestic bank accounts for withdrawal in border regions.

d.    Mexican drug trafficking organizations and their domestic customers often use a variety of tools and techniques to facilitate the above-described activities and to prevent law enforcement from detecting their operations.  These entities often use cellular telephones to speak with, or send text messages to, the members of the organization, including its couriers and customers in the United States.  They also use other telecommunication services such as landlines and paging devices for similar purposes.  When using any of these devices, members of Mexican drug trafficking organizations and their domestic customers occasionally communicate in coded language in an effort to disguise the true nature of their conversations.

4

For instance, they may refer to drugs using innocuous terms, such as articles of clothing, fruits and vegetables, or types of meat. To prevent law enforcement from identifying the telephone numbers that it uses, members and associates of Mexican drug trafficking organizations and their domestic customers often frequently change numbers (e.g., commonly called "dropping phones") or place subscriber information in the names of fictitious or nominee individuals. These enterprises engage in counter-surveillance techniques, including, but not limited to, abruptly altering driving patterns or travel plans in an effort to determine if law enforcement has tracked or otherwise identified its members. Mexican drug trafficking organizations and their domestic customers occasionally use legitimate businesses or legitimate activities as a front for the distribution of illegal drugs or the collection of proceeds therefrom. Drug traffickers, including members of these organizations, frequently carry firearms and other dangerous weapons with them to protect their illegal narcotics and drug proceeds from robbers and rival drug dealers.

5

II.

## PURPOSE OF AFFIDAVIT

4. I make this affidavit in support of search warrants associated with a drug trafficking organization operating in the greater Dayton, Ohio area (Southern District of Ohio) whose members include Joe Wright, Antione Jamison, Dwight Jamison, and others known and unknown to your Affiant. The application seeks the issuance of search warrants for the following residential addresses and vehicles:

a. **126 Westwood Avenue, Dayton, Ohio 45417.** The residence is further described as a two-story single-family residence with light yellow wood siding and a black shingled roof. The numbers "126" appear in black affixed to the front porch pillar to the right of the front door. This property is more fully described in Attachment A, which is attached hereto and incorporated herein by reference.

b. **10501 Landing Way, Apartment 403, Miamisburg, Ohio 45342.** The building is a multi-story apartment building. Apartment 403 is on the fourth floor of the structure; the numbers 403 appear to the left of the apartment. This property is more fully described in Attachment B, which is attached

6

hereto and incorporated herein by reference.

        c.   **3908 Nicholas Road, Dayton, Ohio 45417.**  The residence is further described as a two-story single-family residence with light blue wood siding and a black shingled roof. The numbers "3908" appear in black to the right of the front door.  This property is more fully described in Attachment C, which is attached hereto and incorporated herein by reference.

        d.   **5520 Northford Road, Trotwood, Ohio 45426.** The residence is further described as a single-story ranch residence constructed of red brick and light blue wood siding.  The numbers "5520" appear in stone to the right of the garage door. This property is more fully described in Attachment D, which is attached hereto and incorporated herein by reference.

        e.   A tan/gold Honda Accord, bearing Georgia license plate number RDP 9620.

        f.   A black Chevrolet Avalanche pickup truck, bearing Georgia license plate number RKB 5799.

        g.   A 2018 Dodge Ram 3500 delivery van with the name "Firm Xpress LLC" posted on the sides, bearing Georgia license plate number RLD 0378.

5.   As detailed more fully below, based on the investigation in this case, I assert that there is probable cause to believe that evidence, contraband, and the fruits associated with the following federal felony offenses (collectively, "Target Offenses") is being stored at or can be found in the listed target addresses, including surrounding curtilage and vehicles:

a.   Possession with intent to distribute a controlled substance and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

b.   Unlawful use of a communications facility, in violation of Title 21, United States Code, Section 843(b);

c.   Conspiracy to commit offenses under Title 21, in violation of Title 21, United States Code, Section 846;

d.   Unlawful importation of control substances, in violation of Title 21, United States Code, Sections 952 and 960;

e.   Interstate and foreign travel to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity – namely, a business enterprise involving controlled substances, in violation of Title 18, United States Code, Section 1952(a)(3);

8

f.   Laundering of monetary instruments, in violation of Title 18, United States Code, Sections 1956(a);

g.   Engaging in monetary transactions in property derived from specified unlawful activity, in violation of Title 18, United States Code, Sections 1957.

6.   As detailed more fully below, based on the investigation in this case, I assert that there is probable cause to believe that the following listed individuals and others not yet known (collectively, "Target Subjects") are suspected to be involved in committing the Target Offenses:

a.   Joe L. Wright, a.k.a. "Joe the Boss": date of birth 5/31/1970; known addresses of 10501 Landing Way, Apartment 403, Miamisburg, Ohio 45342 and 126 Westwood Avenue, Dayton, Ohio 45417; Wright is a known narcotics trafficker from the Dayton, Ohio area with prior federal felony convictions for, among other things: conspiracy to possess with intent to distribute and to distribute in excess of 5 kilograms of cocaine (2003); and conspiracy to launder money (2003).

b.   Antione Jamison: date of birth 6/20/1974; known address of 3908 Nicholas Road, Dayton, Ohio 45417; Antione Jamison is a known narcotics trafficker from the Dayton, Ohio

area with prior federal felony conviction for possession with intent to distribute and to distribute cocaine (2003); and conspiracy to launder money (2003).

      c.   Dwight Jamison: date of birth 7/30/1973; known address of 5520 Northford Road, Trotwood, Ohio 45426; Dwight Jamison is a known narcotics trafficker from the Dayton, Ohio area with prior felony convictions for among other things: conspiracy to possess with intent to distribute and to distribute cocaine (2003).

    7.   Based on my training and experience, as described above, I believe that there is probable cause to believe that the items listed in Attachment E will be found at the premises described above.

### III.

### SOURCES OF INFORMATION

    8.   I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation, conclusions I have reached based on my training and experience, and upon information I believe to be reliable from the following

sources: oral and written reports about this investigation and other investigations that I have received from federal agents as well as state and local law enforcement agencies; physical surveillance conducted by federal and local law enforcement agents, the details of which have been reported to me either directly or indirectly; telephone records, including toll records and subscriber information; information developed from cooperating sources; information developed from the use of pen registers and/or trap and trace; public records; evidence obtained from search and seizure operations; electronic global position satellite ("GPS") information for various cell phones and vehicles; and consensually recorded phone calls.

9.   Unless otherwise noted, when I assert that a statement was made, I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report.  The officer providing me with the information may have received the information by way of personal knowledge or from another source.  Except where otherwise noted, the information set forth in this affidavit has been provided directly or indirectly by agents of the FBI or other law enforcement agencies.  Whenever in this affidavit I assert that

a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Moreover, the use of quotations to describe conversations herein either identify the actual words of the speaker or the interpretation of those words.

10. This affidavit does not include every fact known to me through the investigation, but rather those facts required to establish both the probable cause for the issuance of search warrants.

IV.

**PROBABLE CAUSE**

## A. Introduction

11. FBI has identified portions of an ongoing drug trafficking operation that, since at least early 2017, distributes cocaine and heroin from Sinaloa, Mexico to Ohio. As detailed more fully below, the FBI has developed information revealing that Joe Wright serves as the organization's main drug distributor in the Dayton, Ohio area who works in concert with Antione Jamison and Dwight Jamison. Based on previous federal

12

investigations, I know that Wright, Antione Jamison, and Dwight Jamison have significant historical ties to the Ohio drug trade, including prior federal convictions for money laundering and conspiracy to distribute in excess of 5 kilograms of cocaine. It should be noted that, during the early 2000s, Wright as well as both Jamisons were convicted of a federal drug conspiracy involving cocaine, in the United States District Court for the Southern District of Ohio, Case No. 3:01CR99WHR.

**B.    During Summer 2017, FBI Receives Information Tying Wright to a Major Cocaine Distribution Ring**

12.    During July 2017, FBI Cleveland contacted me and advised that a task force in its area linked a telephone in Dayton – namely, 207-289-4608 – to a large drug ring in Northern Ohio.  In particular, federal agents arrested a known individual (hereinafter referred to as COOPERATING WITNESS #1) in the Cleveland area for a federal probation violation.  At the time of the arrest, COOPERATING WITNESS #1 was in possession of two cellular telephones.  Federal agents obtained search warrants for these telephones and found numerous text messages between COOPERATING WITNESS #1 and telephone number 207-289-4608 concerning drug trafficking activity.  (As detailed more fully, FBI Dayton identified the user of 207-289-4608 as Joe Wright).

13

For instance, pursuant to the search warrant, agents recovered the following text messages between Wright at 207-289-4608 and COOPERATING WITNESS's telephone:

     a.    On or about June 13, 2017, Wright and COOPERATING WITNESS #1 engaged in the following text message exchange concerning the distribution of cocaine:

     (1)   On or about June 13, 2017, at approximately 11:08 a.m., Wright at telephone number 207-289-4608 received a text message from COOPERATING WITNESS #1, which read: "Ok if i get 5 how much (price per kilogram)." Based on my training and experience, I believe that, through this message, COOPERATING WITNESS #1 asked Wright at what price he (COOPERATING WITNESS #1) could purchase 5 kilograms of cocaine from Wright.

     (2)   On or about June 13, 2017, at approximately 11:10 a.m., Wright at telephone number 207-289-4608 sent a text message to COOPERATING WITNESS #1, which read, "29750 if its under 30000". Based on my training and experience, I believe that Wright advised COOPERATING WITNESS #1 that he could sell cocaine to COOPERATING WITNESS #1 for a little under $30,000 – namely, $29,750.

b.    On or about June 15, 2017, Wright and COOPERATING WITNESS #1 engaged in another text exchange concerning the potential purchase of cocaine.  In particular:

(1)  On or about June 15, 2017, at approximately 12:30 p.m., Wright at telephone number 207-289-4608 sent a text message to COOPERATING WITNESS #1, which read, "Whats good everything pretty".  Based on my training and experience, I believe that Wright was advising that he possessed high quality drugs for sale.

(2)  On or about June 15, 2017, COOPERATING WITNESS #1 replied via text message to Wright at telephone number 207-289-4608, stating: "Sis off day."  Based on my training and experience, I believe that COOPERATING WITNESS #1 was advising Wright that COOPERATING WITNESS #1's courier was unavailable to pick up any drugs that day.

c.    On or about June 17, 2017, Wright and COOPERATING WITNESS #1 engaged in another text exchange concerning the potential purchase of cocaine.  In particular:

(1)  On or about June 17, 2017, at approximately 2:30 p.m., Wright using telephone number 207-289-4608 sent a text message to COOPERATING WITNESS #1, stating: "Whats good its

15

all good and pretty get at me asap". Based on my training and experience, I believe that Wright was again advising that he possessed high quality drugs for sale and that COOPERATING WITNESS #1 needed to move quickly if COOPERATING WITNESS #1 wanted to purchase any of this product.

(2) On June 17, 2017, at approximately 3:35 p.m., COOPERATING WITNESS #1 replied to Wright at telephone number 207-289-4608, stating: "My fault nothing personal sis off tom can I get 2 i got 59 i got 60 but i gotta give her a g ill owe u a g." Based on my training and experience, COOPERATING WITNESS #1 was apologizing to Wright for the delayed response; COOPERATING WITNESS #1 explained that he had $60,000 in cash with which to purchase two kilograms of cocaine, but had to provide $1,000 of it to the courier who COOPERATING WITNESS #1 would send to pick up the cocaine from Wright.

13. During mid-July 2017, based, in part, on these text messages, FBI Dayton obtained a federal search warrant to collect real-time location information for cellular telephone number 207-289-4608. Through this data, I, along with other federal agents, conducted physical surveillance corresponding to the telephone's location. Based on this surveillance, FBI

16

confirmed that Wright used and possessed at that time the cellular telephone with call number 207-289-4608. For instance:

a. On or about July 14, 2017, I conducted surveillance on Wright in conjunction with active cellular telephone location information on cellular telephone number 207-289-4608. I observed Wright arrive at the Flats at Austin Landing, 10501 Landing Way, Miamisburg, Ohio 45342, driving a black 2015 Chevrolet Impala bearing Georgia license plate PYE-9937, registered to Wright. Wright was the sole occupant of the vehicle. A review of cellular telephone location information for cellular telephone number 207-289-4608 showed the cellular telephone arrived with Wright. A short time later, law enforcement saw Wright leave 10501 Landing Way, Miamisburg, Ohio, in the black Chevrolet Impala, and drive to the parking lot of a nearby Kroger store. Once there, Wright met with another person in the parking lot for approximately 40 minutes before returning to 10501 Landing Way, Miamisburg, Ohio. Again, the location of cellular telephone number 207-289-4608 moved with Wright.

b. During July 2017, the location information for 207-289-4608 placed Wright's cellular telephone at various

17

places around Dayton in addition to 10501 Landing Way, Miamisburg, Ohio. For instance, at various times, the data linked the telephone to homes at 126 Westwood Avenue, Dayton, Ohio, and 3908 Nicholas Road, Dayton, Ohio. Law enforcement performed spot checks at these residences during July 2017 and found cars associated with Wright parked at, or near, these locations. Additionally, a search of Montgomery County Ohio property records showed Wright is the current owner of 126 Westwood Avenue, Dayton, Ohio.

      c.   On or about July 26, 2017, I spoke with the Montgomery County Sheriff's Office concerning a traffic stop that agency had conducted on Wright around that time. According to the Sheriff's Office, during this incident, local police stopped Wright in a tan/gold Honda Accord, Georgia license plate number RDP 9620, near 126 Westwood Avenue, Dayton, Ohio. The Honda Accord was registered to Wright's girlfriend/wife Shala Miller. A police K9 alerted to the odor of narcotics in Wright's vehicle. Although, during an ensuing search of the car, police discovered no drugs, they observed cellular telephones inside of the vehicle. Shortly after this encounter, Wright dropped, *i.e.*, ceased using, cellular telephone number

207-289-4608.

**C.   FBI Obtains Tracking Warrants for Wright's Vehicles and Confirms His Links to Multiple Locations in Dayton**

14.   During summer 2017, FBI obtained federal tracking warrants for several cars that Wright frequently used in the Dayton, Ohio area.   Reviewing the location information from these tracking warrants, I learned that Wright's vehicles frequented a number of common locations, including: 10501 Landing Way, Miamisburg, Ohio; 126 Westwood Avenue, Dayton, Ohio; and 3908 Nicholas Road, Dayton, Ohio.   Based on physical surveillance as well as additional information detailed below, I believe that:

a.   Wright lives at the Flats at Austin Landing, 10501 Landing Way, Apartment 403, Miamisburg, Ohio; a secured apartment complex whose units and their entryways are located internally in that building.

b.   126 Westwood Avenue, Dayton, Ohio likely serves as a stash house – namely, a location at which Wright and his associates store illegal controlled substances and the proceeds from the sales of these drugs.   Portions of 126 Westwood Avenue are surrounded by a high privacy fence and the home has surveillance cameras mounted on it.   Based on my training and

19

experience, I know drug dealers commonly use these "security" features to prevent law enforcement from conducting prolonged surveillance and to deter rivals from stealing their drugs or money. This location currently has utilities listed in Wright's name.

  c. 3908 Nicholas Road, Dayton, Ohio serves as Antione Jamison's residence and a stash house for Jamison to store illegal narcotics, drug sale proceeds, and cellular telephones used to facilitate drug trafficking offenses.

  d. 5520 Northford Road, Trotwood, Ohio serves as Dwight Jamison's residence and a stash house to store tools of the drug trade, including cellular telephones used to coordinate drug deals, the cash proceeds from such activities as well as other indicia of drug trafficking activity such as digital scales, handguns, and other contraband.

**D. Wright Attempts To Coordinate the Delivery of Drug Proceeds to an Undercover Officer**

  15. During late September/early October 2017, FBI and DEA Dayton received information from FBI San Diego concerning a planned drug money pickup in Dayton, Ohio. According to the information from FBI San Diego, which FBI San Diego deemed to have come from a reliable source, drug dealers in Mexico were

arranging for a customer in Dayton, Ohio to deliver drug proceeds to a courier in this area. The reliable source further explained that the sources of supply in Mexico planned for the courier to call the Dayton drug dealer at cellular telephone number 323-517-5971 and use a code word – "Medina" – to indicate that the courier was the individual sent to collect the drug money. Based on this information, FBI and DEA Dayton arranged for an undercover officer (UC) to pose as the courier who would obtain the drug proceeds from the Dayton customer using cell phone number 323-517-5971.

16. On or about October 2, 2017, acting on the tip, the UC contacted and made a recorded call to 323-517-5971 and spoke with a person later identified as Wright, as detailed more fully below. In particular, the UC and Wright engaged in the following conversation:

| | |
|---|---|
| Wright: | "Hello" |
| UC: | "Hello, hello amigo how are you?" |
| Wright: | "Alright, you my friend?" |
| UC: | "Muy bien, I call you from Medina, you know?" |
| Wright: | "Si" |
| UC: | "Ok, I be there tomorrow during in Dayton, no?" |
| Wright: | "Ok, si" |

21

UC:       "Ok, you be ready tomorrow morning?"

Wright:   "Si"

UC:       "Ok, I call you when I get close ok?"

Wright:   "Ok my friend"

UC:       "Ok"

Wright:   "Ok, bye bye"

Given the information from FBI San Diego as well as my familiarity with efforts to launder drug proceeds, I believe that Wright advised the UC that he (Wright) was able to deliver the drug proceeds for transport to Mexico the following day. Based on these events, agents obtained a federal search warrant to obtain real-time location information for cell phone number 323-517-5971. Based on physical surveillance that agents conducted based on this location information, they placed the cell phone with Wright.

17. On or about October 3, 2017, Wright and the UC agreed to meet at a Love's gas station in Dayton, Ohio to complete the money delivery. Soon thereafter, federal agents observed Wright arrive at the Love's in a black Nissan Maxima. Upon arriving at the gas station, Wright called the UC from cell phone number 323-517-5971 and engaged in the following conversation:

UC:         "Bueno"

Wright:     "Come on, get in your car, lets go."

UC:         "Como, you know, I no go no where hombre, I stay here, you bring to me."

Wright:     "No, huh?"

UC:         "I here hombre, just give it to me."

Wright:     "You said what?"

UC:         "Just give it to me hombre, I'm right here."

Wright:     "Nah, I mean, I don't do business out like this in the open."

UC:         "Where do you want to go?"

Wright:     "To my house."

UC:         "Ah, no hombre, I do not go to a house hombre, we do not go to house."

Wright:     "Man I'm not gonna bring all that money out here like that man."

UC:         "Hombre, hombre I cannot go to a house hombre. It's not good for me.  Mira, me never go to a house.  You no like here?"

Wright:     "No, uhu, I don't do this like this. I don't do, I don't bring, that's too much money to be bringin out like that bruh.  I don't do that."

UC:         "Hombre, I cannot go. I, you call you call your people, I call my people.  I don't, I do not go to a house. We never go to the house."

Wright:     "Well you call Medina, let him know, I'm not gonna bring no money out like this, alright."

23

UC:        "Hey hombre."

Based on my training and experience, I believe that, during this call, Wright was advising the UC to follow Wright to a private location where they could complete the money exchange. Wright explained that he did not want to conducted business (i.e., the transfer of the drug money) in a public place.  In response, the UC declined to follow him.  Notably, Wright indicated that he would contact Medina – the Mexican drug dealer to whom the drug money was owed – directly to resolve the stalemate.  Around the time of this exchange, agents observed a second car trailing Wright; Antione Jamison, a known drug dealer and close associate of Wright, was believed to be driving the trail car.  Based on my training and experience, I know that, when drug dealers conduct money drops, they often will have an associate/co-conspirator come with them to serve as a lookout or provide security for the transaction.

18.  Following this conversation over cellular telephone number 323-517-5971, Wright departed the Love's without completing the money drop.  Agents followed Wright as he traveled from the Love's back to his residence at 126 Westwood Avenue, Dayton, Ohio.  Based on my training and experience as

well as the content of the above-described conversation, I believe that Wright had stored the drug proceeds at 126 Westwood Avenue and intended for the UC to follow him to this location to complete the money exchange.

19. On or about October 6, 2017, I conducted an inquiry of various law enforcement databases concerning Wright's cell phone number 323-517-5971. Based on this review, I learned the Wright's cell phone had connections to a DEA investigation in Little Rock, Arkansas. I contacted the task force officer (TFO) handling that investigation and he advised that his matter involved a member of the Sinaloa Cartel named Jose Ignacio Medina-Rios (hereinafter, Medina) who was shipping kilograms of methamphetamine, heroin, and cocaine from Mexico to the United States. The TFO indicated that he had a reliable, confidential source who provided law enforcement with two telephone numbers from which Medina was operating around that time – namely, 52-667-354-3369 and 52-667-331-1132. Based on this information, I reviewed the toll records for Wright's cell phone number 323-517-5971 and confirmed that, on or about September 25, 2017 (or shortly before the planned money drop), Wright's phone had contact with Medina's number at 52-667-331-1132. Notably, as

detailed above, during the conversation between the UC and Wright, Wright expressly mentioned contacting "Medina" to discuss the money drop.

20. On or about October 9, 2017, FBI received information from a reliable, confidential informant that Miguel Flores, using telephone number 909-242-1637, intended to complete the previously aborted money drop with Wright. Based on this information, law enforcement established surveillance at 126 Westwood Avenue that day, where they saw Flores enter and then shortly thereafter, exit the residence. Flores then arranged to meet with the confidential informant and ultimately delivered to the confidential informant approximately $99,800.00 in US currency that was surrendered to FBI agents. Flores also indicated to the confidential informant that he kept $200 from the money he collected for hotel and expenses (Based on Flores' statements, I believed Flores picked up a total of $100,000.00 from Wright). I reviewed toll records for Wright's cell phone number 323-517-5971 around the time of this transaction and learned that Wright's phone had contact not only with Flores at 909-242-1637 but also with Medina at 52-667-354-3369. Based on my training and experience, the toll records from Wright's cell

phone, and the events of October 9, 2017, I believe that, on

that day, Wright delivered the proceeds from drug sales to

Flores for transport back to Medina in Mexico.

**E.  FBI Identifies Another Number Associated with Wright and Confirms his Links to COOPERATING WITNESS #1 as well as the Cocaine Trade**

21.  During late October and early November 2017, law

enforcement identified yet another cellular telephone associated

with Wright – namely, 307-214-7625.  As noted above, following a

traffic stop during late July 2017, Wright dropped telephone

number 207-289-4608.  I conducted a common call analysis between

207-289-4608 and 307-214-7625; in doing so, I discovered that

both numbers frequently had contact with multiple common numbers

thereby confirming that Wright had replaced 207-289-4608 with

307-214-7625.

22.  During early November 2017, I obtained a federal

search warrant for Verizon, the service provider for 307-214-

7625, to produce stored text messages associated with the

number.  Verizon complied with the warrant, and I reviewed the

stored text messages that it produced.  My review confirmed

that, during late October and early November 2017, Wright

utilized cellular telephone number 307-214-7625 to facilitate

drug trafficking activities.  For instance, I found the

27

following drug-related text messages during my review:

a.   On October 26, 2017, Wright's cell phone, i.e, 307-214-7625, received a text message from cellular telephone number 513-952-1999 stating, "Ol girl whole one." I know through training and experience working narcotics related investigations that drug traffickers refer to cocaine as "girl" and a "whole one" as a kilogram amount.

b.   On October 26, 2017, Wright sent a text message back to cell phone number 513-952-1999 that stated, "31500." I know the current street price for a kilogram of cocaine is approximately $31,500.

c.   On October 27, 2017, Wright's cell phone received a text message from cellular telephone number 937-361-6582 stating, "What u wont 4 that 2 1/2." Less than one minute later, Wright responded "2250." I know through training and experience working narcotics related investigations that the current street price of cocaine is $900 per ounce. At that rate, 2 1/2 ounces of cocaine would cost $2,250.

d.   On October 27, 2017, Wright's cell phone sent a text message to cellular telephone number 513-435-6932 stating, "Still bro we have to move that pack fuck who do not like

28

what." I know through training and experience working narcotics related investigations that drug traffickers refer to a "pack" as a shipment of illegal narcotics.

       e.   On October 28, 2017, Wright's cell phone sent consecutive text messages out to 20 different cellular telephone numbers stating, "Pretty." I know through training and experience working narcotics related investigations that drug traffickers send out mass text messages to their customers to describe the look or quality of a recently received shipment of illegal narcotics.

       f.   Following the above mass text, Wright's cell phone received an incoming text from one of the mass text recipients using cell phone number 937-951-5224. The incoming text stated, "Chunky?" Wright's cell phone responded to that same cell phone number stating, "About to bust it open." I believe through training and experience working narcotics related investigations that Wright was telling the customer that he was about to open the shipment and see if the illegal narcotics were in powder form or compressed (chunky).

       g.   On October 29, 2017, Wright's cell phone received a text message from cellular telephone number 614-338-5015

stating, "Need to bring you dat bread an grab another 1." I know through training and experience working narcotics related investigations that "bread" is the street term for money. I also believe that the person who sent the text was telling Wright he/she needed to drop off money to Wright and grab more illegal narcotics.

      h.  On October 30, 2017, Wright's cell phone sent a text message to cellular telephone number 323-972-2133 stating, "You got coke." I know through training and experience working narcotics related investigations that "coke" is another street term for cocaine. Following that outgoing text, cellular telephone number 323-972-2133 responded, "No." Wright then sent a text message to that same number stating, "I got some." 323-972-2133 responded with, "Ticket" (price). Wright responded, "What we been having for but I been fuckin them up with the hook." 323-972-2133 responded, "Do you still got some of it how we split it up." Wright responded, "You can work some." 323-972-2133 responded, "We will chop it up." As detailed more fully below, a confidential source identified the 323 number as a phone number used by Antione Jamison to arrange heroin deals at various locations, including the homes in Westwood and

Nichols road between in or around August 2017 through in or
around December 2017.

i.   On October 31, 2017, Wright's cell phone again
sent consecutive text messages out to 20 different cellular
telephone numbers stating, "She ready and pretty." I believe
through training and experience working narcotics related
investigations that the text messages were letting Wright's
customers know the shipment was in and it looked good.

j.   Following the above mass text, Wright's cell
phone received an incoming text from cell phone number 614-406-
1183. The incoming text stated, "Ready?" Wright's cell phone
responded to that same cell phone number stating, "Come on you
need to get all you can Im going to be gone until Monday."  I
believe through training and experience working narcotics
related investigations that Wright was advising the sender of
the message that he/she needed to pick up the drugs before
Wright sold them all.

k.   On November 1, 2017, Wright's cell phone received
a text message from cellular telephone number 937-580-1019
stating, "I need 5 chunks."  Approximately three hours later,
cellular telephone number 937-580-1019 sent a second text

31

message stating, "4 chunks." I believe through training and experience working narcotics related investigations that the sender of the message was advising Wright concerning the number of ounces that he/she intended to purchase from Wright.

l. On November 1, 2017, Wright's cell phone sent consecutive text messages out to 19 different cellular telephone numbers stating, "What's up its getting late what you going to do." I believe that Wright was letting his customers know he was about to leave town and wanted to know what they wanted to do in terms of placing an order for illegal narcotics.

23. During November 2017, investigators from a federal task force in Cleveland, Ohio, interviewed COOPERATING WITNESS #1. COOPERATING WITNESS #1, who has a criminal history, agreed to speak with federal investigators in an effort to reduce his sentencing exposure to potential drug trafficking charges. During this interview, COOPERATING WITNESS #1 identified a picture of Joe Wright as an individual in Dayton from whom he (COOPERATING WITNESS #1) purchased drugs. According to COOPERATING WITNESS #1, prior to his summer 2017 arrest, he acquired between one and five kilograms of cocaine from Wright on multiple occasions. Additionally, COOPERATING WITNESS #1

32

purchased 100 gram quantities of heroin from Wright on multiple occasions. COOPERATING WITNESS #1 further advised that, on at least one occasion, he sent a kilogram of heroin to Wright in exchange for one or two kilograms of cocaine. COOPERATING WITNESS #1 also indicated that Wright received large shipments of cocaine from a source of supply whom Wright identified as "Unc".

24. During December 2017, it appears that Wright ceased using telephone number 307-214-7625. In particular, that number ceased sending or receiving calls during December 2017.

25. In January 2018, investigators from a federal task force in Cleveland, Ohio, conducted a follow-up interview with COOPERATING WITNESS #1. During the interview, COOPERATING WITNESS #1 reiterated he purchased multiple kilograms of cocaine from Wright and 100 gram quantities of heroin on multiple occasions. COOPERATING WITNESS #1 reportedly traveled to Dayton, Ohio to pick up the narcotics and met Wright at a residence Wright controlled. COOPERATING WITNESS #1 was shown a photograph of the front of Wright's residence at 126 Westwood Avenue and advised it appeared to be the same residence where COOPERATING WITNESS #1 picked up cocaine and heroin from Wright.

COOPERATING WITNESS #1 further explained he and Wright always entered through the rear of the residence off an alley. COOPERATING WITNESS #1 also advised the backyard at that residence is fenced in.  COOPERATING WITNESS #1 remembered seeing kilogram quantities of cocaine and heroin inside the residence as well as a motor operated compressor, which Wright used to process the narcotics.  The last time COOPERATING WITNESS #1 was inside 126 Westwood Avenue was late April or early May 2017.

**F.  During January 2018, Wright Arranges Yet Another Drug Money Drop**

26.  On or about January 3, 2018, Department of Homeland Security agents and task force officers conducted routine surveillance around a known high drug trafficking area in Dayton, Ohio – namely, the Red Lion Inn and Suites near Miller Lane.  While there on that day, task force members observed Wright's tan/gold Honda Accord, bearing Georgia license plate number RDP 9620, arrive and park in a lot near the motel.  The agents then saw a Hispanic male, later identified but hereinafter referred to by the initials D.E., walk from the motel to the car.  D.E. entered the car carrying nothing.  A short time later, he exited the car, holding a weighted, plastic

34

shopping bag. The car then left the area at a high rate of speed.

27. That same day, just after the suspected money exchange between D.E. and Wright, FBI task force members conducted physical surveillance at 126 Westwood Avenue, Dayton, Ohio and 3908 Nicholas Road, Dayton, Ohio. During the surveillance, task force members observed Antione Jamison's white Ford Taurus, bearing Ohio license plate number GOH 1098, leave his residence at 3908 Nicholas Road and later arrive at 126 Westwood Avenue. Task force members also observed Wright's Honda Accord parked in the rear of 126 Westwood Avenue. Additional vehicles were also observed coming and going from the rear of 126 Westwood Avenue to include a black Chevrolet Avalanche pickup truck driven by Wright. Georgia license plate number RKB 5799 was attached to the Chevrolet Avalanche, which was registered to Wright.

28. On or about January 4, 2018, agents followed D.E. and a traveling companion as they entered and exited various stores throughout the Dayton area. Agents spoke with clerks at various stores and learned that D.E. and his companion had attempted to wire money internationally; based on my training and experience, I know that, after receiving a drug money drop, couriers attempt

to wire most, if not, all of the money internationally to
Mexico.

29.  After learning this information, agents approached
D.E. as he left one of the stores.  During the ensuing
conversation, D.E. acknowledged that he was attempting to wire
money and had been sent to the area to pick up drug proceeds.
D.E. agreed to cooperate with authorities and told them that he
had additional bulk cash hidden in his motel room at the Red
Lion.  D.E. explained that his father owed money to a Mexican
drug dealer in Sinaloa Mexico known as "Marco."  D.E. advised
his father was previously convicted in the U.S. on federal drug
trafficking charges and was deported to Mexico following his
incarceration.  D.E. reported his father had also been
incarcerated in Mexico on drug trafficking offenses.  D.E. had
agreed to pick up this money in Ohio for his father to pay back
the debt and earn money for himself.  D.E. explained that he had
made an earlier trip to the Dayton area on or about December 22,
2017 to pick up drug money.  However, when he arrived, the
person in Dayton mistakenly thought that D.E. was there to bring
drugs, not to pick up cash.  D.E. provided agents with access to
his cellular telephone, which still contained his text message

exchange with the Dayton contact – namely, Wright – using cell
phone number 323-517-5971.  In this exchange, which occurred
between December 22 and 23, 2017, D.E. and Wright engaged in the
following conversation:

| | |
|---|---|
| D.E.: | "I'm at la quota inn" |
| Wright: | "Ok" |
| Wright: | "Do you have the stuff" |
| Wright: | "Where is the stuff" |

Based on my training and experience, I believe that these text
messages corroborate D.E.'s statement that he made a previous
trip to Dayton during which his contact here mistakenly believed
that he was delivering narcotics, not picking up drug money.
Through the exchange, D.E. advised that he was at the La Quinta
Inn (spell corrected to "la quota"), a motel located in a high
drug trafficking area in Dayton, Ohio.  In response, Wright
acknowledged D.E. and then inquired where the "stuff", *i.e.*,
drugs, were.

30.  D.E. advised agents that, on his current trip to
Dayton, a black man who looked like a skinnier version of Rick
Ross had delivered the drug proceeds to him the preceding day.
(Based on my familiarity with Wright, I know that D.E.'s

description matches Wright). D.E. revealed that Wright intended to make a second delivery of drug proceeds to him that day.

31. During January 4, 2018, acting at the direction of federal agents, D.E. engaged in a text exchange with Wright at cell phone number 323-517-5971. During this exchange, Wright indicated that he would not be able to make the money drop that day. In particular the text messages read:

| | |
|---|---|
| D.E.: | "Let me know when" |
| Wright: | "When" |
| Wright: | "Not tonight" |

32. On or about January 4, 2018, upon receiving that last text message, agents directed D.E. to make a recorded telephone call to Wright. During this recorded conversation, Wright and D.E. engaged in the following discussion:

| | |
|---|---|
| D.E.: | "Hey what's going on man?" |
| Wright: | Unintelligible |
| D.E.: | "I thought I was gonna finish tonight." |
| Wright: | "Huh?" |
| D.E.: | "I thought I was gonna finish tonight." |
| Wright: | Unintelligible |
| D.E.: | "Or, I wanted to finish tonight." |

38

Wright:          "Huh?"

D.E.:            "I wanted to finish tonight."

Wright:          Unintelligible

D.E.:            "What's that?"

Wright:          "Huh?"

D.E.:            "I can't hear you."

Wright:          Unintelligible

D.E.:            "Well….I wanna, I thought we were gonna meet up earlier."

Wright:          "Oh yeah yeah, I mean, things have come in though but I'm saying, you can't do nothing tonight can you?"

D.E.:            "No I can't do it tonight, uh, but you know."

Wright:          "Ok we'll get together."

D.E.:            "If I get it tonight (unintelligible)…morning"

Wright:          "Right, we go early in the morning."

D.E.:            "Alright, uh what time you thinkin?"

Wright:          "Early"

D.E.:            "Alright you give me a call then."

Wright:          "Ok brother."

D.E.:            "Alright"

Based on my training and experience, I know that, during this conversation, D.E. expressed concern over the timing of the next money delivery. Wright assured D.E. that the delivery would occur early the following morning – namely, January 5, 2018.

33. On the morning of January 5, 2018, D.E. received an incoming text message from Wright (It should be noted that I have seen and reviewed copies of this text message). Using cell phone number 323-517-5971, Wright advised D.E.: "will be to see you here shorty [sic] I will call you once im pulling up." Based on my training and experience, I believe that, through the text message, Wright advised that he planned to deliver the remainder of the drug proceeds that morning and would call once he was at the meet location.

34. During the morning of January 5, 2018, consistent with the text message, Wright arrived in his Honda Accord (same car Wright drove during the first money drop on January 3, 2018 at the Red Lion parking lot). A trail car known to be driven by Antione Jamison– namely, a white Taurus, bearing Ohio license plate number GOH 1098, followed Wright. The white Taurus ultimately positioned itself across the entry of the Red Lion's parking lot so that no other cars could enter or exit the area.

Soon thereafter, Wright provided D.E. with a second bag that contained thousands of dollars in United States currency. D.E. surrendered the bag to federal agents. D.E. confirmed that Wright was the same man who had delivered drug proceeds to him days earlier. Having counted the money from the two money drops, agents determined that Wright had delivered approximately $149,260 to D.E.

35. FBI task force members conducted physical surveillance during the aforementioned money drop and noted Wright returned to 126 Westwood Avenue in his Honda Accord after the drop and Antione Jamison returned to 3908 Nicholas Road in his Ford Taurus after the drop. Wright ultimately returned to the Austin Landing apartment complex.

36. Based on my training and experience, I know that $149,260 represents a significant amount of drug proceeds generated from Wright's sale of bulk quantities of narcotics.

37. Shortly after the aforementioned money seizure, Wright discontinued his use of cellular telephone number 323-517-5971. I believe Wright changed his number after learning law enforcement officials interdicted and seized the money he delivered to D.E.

G.   **Controlled Purchases of Heroin During February and March 2018**

38.   In February 2018, I and FBI Task Force Officer Michael Fuller interviewed an individual, hereinafter referred to as Confidential Source One (CS1).  CS1 has a criminal history and provided information to myself and TFO Fuller in exchange for consideration in a pending drug investigation.  CS1 identified Antione Jamison as a heroin dealer operating in the Dayton, Ohio whom CS1 has personally purchased ounce quantities of heroin from on approximately 20 occasions beginning in August 2017. CS1 reported those prior heroin transactions occurred at Jamison's residence at 3908 Nicholas Road and a residence at 126 Westwood Avenue, Dayton, Ohio.  CS1 also identified Antione Jamison's brother, Dwight Jamison, as a heroin dealer and a member of the same drug trafficking organization.  CS1 confirmed that he often contacted Antoine Jamison at 323-972-2133 to arrange these drug sales.

39.   On or about February 14, 2018, CS1 participated in a controlled and monitored purchase of heroin from Dwight Jamison. Prior to purchase, CS1 placed a monitored and recorded call to Dwight Jamison at cellular telephone number 937-668-3017. Dwight Jamison agreed to sell CS1 heroin and directed CS1 to a

42

location in the Dayton, Ohio area.  At the time of the call, FBI
task force members established physical surveillance on Dwight's
brother, Antione Jamison's residence at 3908 Nicholas Road,
Dayton, Ohio.  Approximately five minutes after the call, Dwight
Jamison arrived at Antione's residence (3908 Nicholas Road)
driving a silver Chevrolet Impala, bearing Ohio license plate
number HFD 9047.  Dwight exited his vehicle and entered the
residence briefly before returning to his vehicle.  When Dwight
exited the residence, FBI TFO Pat Bell observed Antione Jamison
standing inside the residence looking out the front door.
Dwight then drove to the meet location where he provided CS1 a
quantity of heroin in exchange for money.  The heroin was seized
by FBI task force members as evidence.  Following the
transaction, Dwight drove back to 3908 Nicholas Road and entered
the residence for approximately two minutes before leaving.
Based on my training and experience, I believe that Dwight
acquired the drugs that he sold from Nicholas Road residence.

40.  On or about February 21, 2018, CS1 participated in a
second controlled purchase of heroin from Dwight Jamison.  CS1
placed a monitored and recorded call to Dwight Jamison at
cellular telephone number 937-668-3017. Dwight Jamison agreed to

43

sell CS1 heroin and directed CS1 to a location in the Dayton, Ohio area. At the time of the call, FBI task force members established physical surveillance on Antione Jamison's residence at 3908 Nicholas Road and Dwight Jamison's residence at 5520 Northford Road, Trotwood, Ohio. After the call, task force members observed Dwight Jamison exit his residence and enter the same silver Chevrolet Impala that he drove during the February 14, 2018 controlled buy. Dwight drove away from his residence and arrived at 3908 Nicholas Road approximately 15 minutes later. Dwight entered the residence at 3908 Nicholas Road for approximately six minutes before leaving and driving to the meet location. Dwight again provided CS1 a quantity of heroin in exchange for money. The heroin was seized by FBI task force members as evidence. Following the transaction, Dwight drove back to 3908 Nicholas Road and entered the residence. Based on my training and experience, I believe that Dwight acquired the drugs that he sold from Nicholas Road residence.

41. On or about March 1, 2018, CS1 participated in a third controlled and monitored purchase of heroin from Dwight Jamison. Prior to the purchase, CS1 placed a monitored and recorded call to Dwight Jamison at cellular telephone number 937-668-3017.

Dwight Jamison agreed to sell CS1 heroin and directed CS1 to a location in the Dayton, Ohio area.  At the time of the call, FBI task force members established physical surveillance on Antione Jamison's residence at 3908 Nicholas Road and Dwight Jamison's residence at 5520 Northford Road, Trotwood, Ohio.  After the call, task force members observed Dwight Jamison leave his residence in the same silver Chevrolet Impala.  Dwight drove to 3908 Nicholas Road and waited in the driveway until Antione Jamison arrived driving his white Ford Taurus.  Both Dwight and Antione were observed entering the residence for a brief period. Dwight exited the residence and drove to the meet location where he provided CS1 an amount of heroin in exchange for money. The heroin was seized by FBI task force members as evidence.  Based on my training and experience, I believe that Dwight acquired the drugs that he sold from Nicholas Road residence.

## H.   Physical and Electronic Surveillance of Wright

42.  On or about January 29, 2018, FBI task force members conducted physical surveillance on Wright and his girlfriend Shala Miller.  During the surveillance, task force members observed Miller driving the tan/gold Honda Accord, Georgia license plate number RDP 9620 (same vehicle Wright utilized in

the two aforementioned money drops). Miller was observed meeting up with Wright who was driving a 2018 Dodge Ram 3500 delivery van with the name "Firm Xpress LLC" posted on the sides. The vehicle, bearing Georgia license plate number RLD 0378, was registered to Wright. After meeting, Miller and Wright took separate routes and Wright drove the delivery van back to 10501 Landing Way, Miamisburg, Ohio. Wright parked the delivery van in the parking lot and later left in his black Chevrolet Avalanche pickup truck. At my request, Montgomery County Ohio Sheriff's Office Detective Tony Hudson responded with his state certified narcotics K9 Gunner. Detective Hudson conducted a free air sniff around Wright's delivery van with K9 Gunner. K9 Gunner alerted to the odor of narcotics around the passenger side sliding door of the delivery van.

43. On January 24, 2018, FBI task force members installed GPS tracking devices on Wright's tan/gold Honda Accord and his black Chevrolet Avalanche. At the time, both vehicles were parked in the parking lot at 10501 Landing Way, Miamisburg, Ohio. I have reviewed the location information and travel routes for both vehicles until March 4, 2018 and noted the following:

46

a.   Wright's black Chevrolet Avalanche consistently stays parked at 10501 Landing Way, Miamisburg, Ohio during the overnight hours.  Between January 24, 2018 and March 4, 2018, Wright's Chevrolet Avalanche has traveled to and from 126 Westwood Avenue, and 3908 Nicholas Road on multiple occasions. The last date Wright's black Chevrolet Avalanche traveled to the Westwood Avenue address and Nicholas Road address was on March 2, 2018.

b.   Wright's tan/gold Honda Accord consistently stays parked at 10501 Landing Way, Miamisburg, Ohio during the overnight hours.  Between January 24, 2018 and March 4, 2018, Wright's Honda Accord has traveled to and from 126 Westwood Avenue, and 3908 Nicholas Road on multiple occasions.  The last date Wright's Honda Accord traveled to the Westwood Avenue address and Nicholas Road address was on March 3, 2018.

c.   Based on my training and experience as well as the pattern of drug trafficking activity established in this affidavit, I believe that Wright's pattern of travel reveals that all three residences are associated with his ongoing drug enterprise.  His frequent travels to both the Westwood and Nicholas residence indicate that Wright often goes to those

47

locations to oversee drug trafficking activity occurring there, including processing and sale of drugs as well as storage of currency and communication devices. Additionally, Wright's presence at the Austin Landing location also links this residence to the drug trade. As the various cell phone pings described above confirm, Wright frequently keeps the cellular telephones that he uses to communicate with other drug dealers on his person or at his actual residence. Additionally, as detailed more fully below, I know that drug dealers often keep bulk currency, title documents for assets representing the proceeds of the drug sales, keys to vehicles, electronic devices (such as computers, smart phones, and tablets) that they use to communicate with confederates and associate with these individuals on social media platforms.

44. Additionally, at least one neighbor of Wright's at Austin Landing has lodged a complaint against Wright's delivery van, indicating that it had potential links to criminal activity. More precisely, during mid-February 2018, the complainant sent an email to a public official in Montgomery County, Ohio, expressing concern over the Firm Xpress LLC delivery van frequently parked at Austin Landing. (As noted

48

above, law enforcement has observed this van parked near the Flats at Austin Landing, including as recently as March 6, 2018; additionally, a narcotics dog alerted to the odor of drugs on this van during late January 2018).  According to the complainant, on several occasions, she heard noises coming from the van that sounded like animals or people trapped inside. Although the complainant suggested that the owner of the van may be using it for human trafficking, the FBI's investigation indicates that her observations are more consistent with the use of the delivery van to hide or smuggle drugs or the proceeds therefrom.

45.  Moreover, based on my training and experience, I know that drug traffickers frequently engage in the following common practices and activities:

a.  It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and cellular services by using other person's names in order to avoid detection by law enforcement officials.

b.  It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees"

49

to obtain telephone service, utility service, and other services
to hide the true identity of the owner or person who will use
that service.

c. That drug traffickers often place assets in
corporate entities in order to avoid detection of those assets
by law enforcement officials.

d. It is common practice, that even though these
assets are in nominee names, drug traffickers will continue to
utilize these assets by exercising dominion and control over
them.

e. It is common practice that drug traffickers
possess large amounts of U.S. Currency in order to finance their
ongoing illicit drug business and keep this contraband at their
personal residences or at stash houses.

f. It is common practice that, at their residences
or stash houses, drug traffickers maintain books, records,
receipts, notes, ledgers, airline tickets, money orders, and
other documents relating to the transportation and distribution
of drugs. Drug traffickers commonly front (provide drugs on
consignment) to their clients. The books, records, receipts,

50

notes, ledgers, and other documents are kept where the drug
traffickers have ready access to them, such as their residences
or at stash houses.

g.   It is common for drug traffickers to provide
false information to law enforcement officials regarding their
identity and the address of their actual residence.

h.   That persons involved in drug trafficking conceal
from law enforcement in their residences, vehicles, and
businesses the following items: drugs, large amounts of
currency, financial instruments, jewelry, automobile titles,
other items of value and/or proceeds of drug transactions, and
evidence of financial transactions relating to the acquisition
and concealment of large sums of money resulting from drug
trafficking activities.

i.   When drug traffickers amass large proceeds from
the sale of drugs, they attempt to hide the true source of these
profits, otherwise known as laundering the money. To accomplish
this, drug traffickers many times utilize banks and/or financial
institutions with their attendant services, including but not
limited to, cashier's checks, money drafts, and letters of
credit.  Other entities used to launder drug proceeds include

51

real estate firms and purported legitimate business fronts.
Drug traffickers frequently keep such records at their
residences or at stash houses.

j.   Drug traffickers commonly travel to facilitate
their trafficking activities. After purchasing drugs,
traffickers commonly transport, or cause to be transported,
drugs to areas in which they will be distributed. Common methods
of transportation include, but are not limited to, commercial
airlines, and rental/private automobiles.  Drug traffickers
frequently keep records relating to such travel at their
residences or at stash houses.

k.   It is common practice that drug traffickers
commonly maintain books and similar documents which reflect
names, addresses, and/or telephone numbers of their associates
in the drug trafficking organization.  This information can
often be stored in cellular phones in places such as the
contacts list.  Drug traffickers frequently keep such materials
at their residences or at stash houses.

l.   Drug traffickers often take, or cause to be
taken, photographs of themselves, their associates, their
property and their product, and that the photographs are usually

52

maintained at the residences, businesses, stash houses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones and other electronic media, such as computers and tablets.

m.   Drug traffickers commonly have in their possession, (that is on their person, at their residence, stash houses, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.   Drug traffickers frequently maintain hidden compartments within their residence, stash houses and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.   The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code,

53

understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p.    Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

q.    I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone."  The money phone is used primarily to communicate with those customers.  The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed.  The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point.  Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.  Drug traffickers often maintain money phones at their homes, stash houses, businesses or on their person.

Based on the foregoing, I respectfully submit that there is probable cause to issue search warrants for the above-described locations.


_Robert M. Buzzard_

Robert Buzzard
Special Agent
Federal Bureau of Investigation


Sworn and subscribed before me on the _6th_ day of _March_ 2018.


_Sharon L. Ovington_

Sharon L. Ovington
United States Magistrate Judge

56

ATTACHMENT A

126 Westwood Avenue, Dayton, Ohio 45417, including any outbuildings, garages, sheds or curtilage at this location.  The residence is further described as a two-story single-family residence with light yellow wood siding and a black shingled roof.  The numbers "126" appear in black affixed to the front porch pillar to the right of the front door.

ATTACHMENT B

10501 Landing Way, Apartment 403, Miamisburg, Ohio 45342, including any outbuildings and curtilage at this location. The building is a multi-story apartment building. Apartment 403 is on the fourth floor of the structure; the numbers 403 appear to the left of the apartment.

ATTACHMENT C

**3908 Nicholas Road, Dayton, Ohio 45417,** including any outbuildings and curtilage at this location.  The residence is further described as a two-story single-family residence with light blue wood siding and a black shingled roof.  The numbers "3908" appear in black to the right of the front door.

ATTACHMENT D

**5520 Northford Road, Trotwood, Ohio 45426,** including any outbuildings and curtilage at this location. The residence is further described as a single-story ranch residence constructed of red brick and light blue wood siding. The numbers "5520" appear in stone to the right of the garage door.

ATTACHMENT E

I submit that there is probable cause to search for the following
items:

A.  Log books, records, payment receipts, notes, and/or customer
    lists, ledgers, and other papers or electronic records
    relating to the transportation, ordering, purchasing,
    processing, and distribution of controlled substances.

B.  Papers, tickets, notices, credit card receipts, travel
    schedules, travel receipts, passports, and/or records, and
    other items relating to domestic and foreign travel to obtain
    and distribute narcotics and narcotics proceeds, including,
    but not limited to airline receipts, vehicle rental receipts,
    credit card receipts, travel schedules, diaries, hotel
    receipts, truck logs, travel agency vouchers, notes, records
    of long distance telephone calls, e-mail and other
    correspondence.

C.  Address and/or telephone books and papers reflecting names,
    e-mail and physical addresses and/or telephone numbers of
    individuals, partnerships, or corporations involved in drug
    trafficking and money laundering.

61

D.   Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E.   Electronic equipment such as pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios.

F.   United States currency, precious metals, coins bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G.   Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H.   Indicia of occupancy, residency, and/or ownership of the premises, and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

I.   Illegal drugs, including, but not limited to cocaine, heroin and other controlled substances, and other tools used in the drug trade, including, but not limited to, scales, vacuum sealers, packaging material, presses, razor blades and cutting agents.

J.   Firearms and ammunition.

K.   Any computers, cellular telephones, tablets or electronic devices that may contain the above-described documents or items in electronic format.

L.   Text messages, instant messages and the like that concern or relate to drug trafficking activity, including, but not limited to, sale prices, drug quantities, customers, sources of supply, or storage locations,

ATTACHMENT 1

a.   Possession with intent to distribute a controlled substance and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

b.   Unlawful use of a communications facility, in violation of Title 21, United States Code, Section 843(b);

c.   Conspiracy to commit offenses under Title 21, in violation of Title 21, United States Code, Section 846;

d.   Unlawful importation of control substances, in violation of Title 21, United States Code, Sections 952 and 960;

e.   Interstate and foreign travel to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity – namely, a business enterprise involving controlled substances, in violation of Title 18, United States Code, Section 1952(a)(3);

f.   Laundering of monetary instruments, in violation of Title 18, United States Code, Sections 1956(a);

g.   Engaging in monetary transactions in property derived from specified unlawful activity, in violation of Title 18, United States Code, Sections 1957.